# UNITED STATES DISTRICT COURT

for the
District of Colorado

In the Matter of the Search of

|  |  |
|---|---|
| 6746 South Revere Pkwy Suite 135, Centennial, CO 80012, more fully described in Attachment A, attached hereto, and the person of Parker Wilson, and the vehicle, 2004 Nissan Pathfinder, CO plates (189PUU), registered to Parker Wilson, located at the property at the time of the search warrant execution | ) ) ) ) ) ) ) ) |

Case No. 20-sw-00680-NRN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. §§ __2252 and 2252A__, and the application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*s/John Donohoe*
*Applicant's signature*

_____
John Donohoe, FBI Task Force Officer
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: __06/09/2020__

_____
*Judge's signature*

City and state: __Denver, CO__

Magistrate Judge N. Reid Neureiter
*Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The Subject Premises is located at 6746 South Revere Pkwy Suite 135, Centennial, CO.

The location was found to be an office park, Parkgate. I found the building address "6746" to be

clearly marked on the building and on the entrance just right of the door with white numbers and

letters. The suite number "135" is located to the left of the door in white numbers, clearly visible.

The place to be searched also includes the person of Parker Wilson and the 2004 Nissan

Pathfinder, CO plates (189PUU) registered to Parker Wilson, if present at the Subject Premises

at the time of the search warrant execution.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located within the premises at 6746 South Revere Pkwy Suite 135, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5) (hereinafter "Subject Offenses"):

1.  Images or visual depictions of child pornography;

2.  Records and information containing child erotica, including texts, images and visual depictions of child erotica;

3.  Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;

4.  Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors;

5.  Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning Internet activity reflecting a sexual interest in minors or child pornography;

6.  Any and all information, notes, software, documents, records, or correspondence, in any form and medium pertaining to any minor who is, or appears to be, the subject of any visual depiction of child pornography, child erotica, sexual activity with other minors or adults, or of sexual interest, or that may be helpful in identifying any such minors;

7.  Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the computer or by other means for the purpose of committing the Subject Offenses;

8.  Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that provide or make accessible child pornography;

9.  Any and all cameras, film, videotapes or other photographic equipment that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of the Subject Offenses;

10. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to the Subject Offenses;

11. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to the Subject Offenses;

12. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to occupancy or ownership of the premises and use or ownership of computer equipment found in the premises, or that aid in the identification of persons involved in the Subject Offenses;

13. Credit cards, credit card information, bills and payment records pertaining to violations of the Subject Offenses;

14. Information about usernames or any online accounts or email addresses that include "Parker Wilson" and "parker@amidenver.com, the use of Comcast, or the IP address 2601:280:c381:7080:4d88:bdf5:c2a9:2051 or 2603:300b:701:7e00:55a4:4882:5936:def6;

15. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Subject Offenses; and

16. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

   a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

   b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

   e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.   evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

g.   records of or information about Internet Protocol addresses used by the COMPUTER, including IP address 2601:280:c381:7080:4d88:bdf5:c2a9:2051 and 2603:300b:701:7e00:55a4:4882:5936:def6;

h.   information about usernames or any online accounts or email addresses that include "parker@amidenver.com";

i.   evidence indicating the computer user's state of mind as it relates to the crime under investigation, namely crimes involving child exploitation and child pornography;

j.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l.   contextual information necessary to understand the evidence described in this attachment;

m.   volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

n.   images and visual depictions of child pornography;

o.   records and information containing child erotica, including texts, images and visual depictions of child erotica;

p.   any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offenses;

q.   any and all information, notes, documents, records, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors; and

r.   items otherwise described above in paragraphs 1- 16 of this Attachment B.

Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device.  Law enforcement personnel may also depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device in order to gain access to applications on the device that may be locked with a fingerprint or thumbprint.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

DEFINITIONS:

17. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

18. "Child Pornography" is defined in 18 U.S.C. § 2256(8), which includes as any visual depiction of sexually explicit conduct involving the use of a minor; a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaged in sexually explicit conduct; or a visual depiction that has been created, adapted, or modified to appear than an identifiable minor is engaging in sexually explicit conduct.

19. "Visual depiction" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

20. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions; this also includes texts or discussions regarding minors engaged in sexual acts or conduct.

21. As used above, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## AFFIDAVIT

I, John Donohoe, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Denver Police Department Detective and a FBI Task Force Officer currently assigned to the Denver FBI Child Exploitation Task Force. I have been employed with the Denver Police Department since 2000. I have been assigned to the Denver FBI Child Exploitation Task Force since February 2016. I have received training in Crimes Against Children investigations and am familiar with child pornography investigations and the Innocent Images National Initiative. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A. I have received training and instruction in the field of investigation of child pornography and have had the opportunity to participate in investigations relating to the sexual exploitation of children. As part of my training and experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as storage devices, the Internet, and printed images).

2. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5) are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5. This investigation concerns alleged violations of 18 U.S.C. Sections 2252 and 2252A relating to material involving the sexual exploitation of minors.

6. Title 18 U.S.C. Sections 2252 and 2252A prohibit a person from knowingly possessing or accessing sexually explicit images (child pornography) with the intent to view them as well as transporting, receiving, distributing, or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (child pornography).

## DEFINITIONS

The following definitions apply to this Affidavit and Attachment B to this Affidavit:

7. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

8. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

9. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

10. "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

11. "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

12. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## SEIZURE AND SEARCH OF COMPUTERS

13.  As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises**,** there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

14.  For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

15.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

16.  Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.

Computer file systems can record information about the dates files were created and the sequence in which they were created.

17. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

18. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce.  In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

19. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit offenses involving the sexual exploitation of minors.  Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein.  The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

20. Information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

21. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence or office.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"  instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. For example, I know from training and experience that persons trading in, receiving,

4

transporting, distributing, or possessing images involving the sexual exploitation of children or those interested in the firsthand sexual exploitation of children often communicate with others through correspondence or other documents which could tend to identify the origin and possessor of the images as well as provide evidence of a person's interest in child pornography or child sexual exploitation.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

22. I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence or office.

23. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

24. Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes involving child exploitation, they should all be seized as such.

25. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

26. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

    C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

27. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

    A. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

    B. The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored

data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

C.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

D.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

E.   Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In

7

order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

28. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site  seizing, imaging and searching as well as off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29. As set forth further below, the Subject Premises is associated with The Awakened Mind Institute (AMI) ("The Company").   The Company may be a functioning company that conducts legitimate business. The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business. Execution of a warrant will likely involve conducting an investigation on the scene regarding which computers or storage media must be seized or copied, and which computers or storage media need not be seized or copied. Where appropriate and possible, members of law enforcement will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business.

30. I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

31. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the

device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

32. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require.

33. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. If the operating system is version 9.3 or later, that time frame shrinks to 8 hours.

34. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the Subject Premises while executing the search warrant. The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

35. In addition, I know from my training and experience that many other mobile device manufactures have their own version of Touch ID—that is, a fingerprint recognition feature that the device's user can program and use to unlock the device. For instance, I know that Google Pixel phones and Google Pixel XL phones have a fingerprint sensor that can be used to unlock the device. Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors.

36. Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or

fingerprint.  Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

37. Further, if a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

38. Similarly, if a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

39. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

40. I have reason to believe that one or more digital devices ("the Device(s)"), will be found during the search.  Based on my training and experience and the investigation in this matter, I know that the subject Dropbox account, discussed below, was accessed using a cellular telephone or other electronic device.  As such, I expect that at the time of executing the search warrant, we will find either an Apple iPhone or an Android phone at the Subject Premises.  The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

41. Due to the foregoing, I am informing the Court that if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, law enforcement personnel intends to obtain from Parker Wilson the display of any physical biometric characteristics

(such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of Parker Wilson to the fingerprint scanner of the Device(s) found at the Subject Premises; (2) hold the Device(s) found at the Subject Premises in front of the face of Parker Wilson to activate the facial recognition feature; and/or (3) hold the Device(s) found at the Subject Premises in front of the face of Parker Wilson to activate the iris recognition feature, for the purpose of unlocking the Device(s) in order to search the contents as authorized by this warrant.

## BACKGROUND REGARDING THE INTERNET AND CHILD EXPLOITATION

42. I have been formally trained in the investigation of crimes involving the sexual exploitation of children.  I also own my own computer, have personal knowledge of the operation of a computer, and have accessed the Internet for numerous years.  Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

43. Child pornographers can produce images using a wireless device such as a cell phone. Photos can also be made using cameras, then can be transferred onto another device either using wire or wireless technology.  Images can also be uploaded to Internet-based storage commonly referred to as the "cloud." Hard-copy images can also be scanned into a computer.  Via the Internet, connection can be made to literally millions of computers around the world.  Child pornography can be transferred quickly and easily via electronic mail or virtually countless other online platforms, communication services, storage services, and applications.

44. A computer's capability to store images in digital form makes it an ideal repository for child pornography and other files related to the sexual abuse and exploitation of children.  The digital-storage capacity in devices and in the "cloud" has grown tremendously within the last several years.  Thumb drives with a capacity of 32 gigabytes are not uncommon.  Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon.  Phones with over 100 gigabytes in storage are not uncommon.  Devices can store thousands of images and videos at very high resolution.  These devices are often internet capable and can not only store, but can transmit images via the internet and can use the devices to store images and documents in internet or "cloud" storage spaces.  Once this is done, there is no readily apparent evidence at the "scene of the crime".  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

45. With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer.  The process of transporting an image file to one's own computer is called "downloading".  The user can then display the image file on his computer screen, and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laser or inkjet printer).  Sometimes the only method to recreate the evidence trail of this behavior is with careful laboratory examination of the computer, modem, printer, and other electronic devices.

11

46. I know from training and experience that search warrants of residences or offices involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

47. I know from training and experience that search warrants of residences or offices usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## **INVESTIGATION**

48. On March 17, 2020, the FBI Denver Office received information from the Colorado Springs Police Department Internet Crimes Against Children (ICAC) Unit regarding a subject in Denver, Colorado possibly involved in the transmission and possession of child pornography.  This information was based on a National Center for Missing and Exploited Children ("NCMEC") CyberTip.

49. I am aware NCMEC is a national clearinghouse for law enforcement of images of child pornography that are collected in the course of child sexual exploitation investigations.  A CyberTip report is typically sent by an internet hosting company or web hosting company to NCMEC when it suspects that its services are used to host images of child pornography.

50. On March 16, 2020, a NCMEC CyberTip, Report #63413953, was received by the Colorado Springs Police Department ICAC Unit regarding an individual who was reported by Dropbox Inc. as uploading a child pornography file to a Dropbox account.  One image depicting child pornography was posted to a Dropbox account created by Screen/Username: Parker Wilson, ESP ID: 16151870, and email address parker@amidenver.com.  The Electronic Service Provider (ESP), Dropbox, confirmed it viewed the entire contents of the uploaded file and found the image to be apparent child pornography. The ESP also confirmed the entire contents of all files were made publicly available.

51. On March 17, 2020, I received one file of child pornography in conjunction to the Dropbox CyberTip.  I reviewed the file, which had been previously viewed by Dropbox, and confirmed the image to be child pornography. Example of the image is as follows:

    A. Image "0_357.jpg" - A prepubescent naked female bent over on a table with her legs spread exposing her vagina and buttocks area.

52. On March 23, 2020, I served an administrative subpoena to the ISP, Comcast, for the subscriber information related to the IP addresses utilized by Dropbox account using email parker@amidenver.com at the date and time the user logged on to his or her Dropbox account.  Based on the results provided by Comcast, the following information was associated with the IP addresses: (1) IP Address: 2601:280:c381:7080:4d88:bdf5:c2a9:2051

assigned on 11-27-2019 at 06:43:06 UTC, Subscriber Name: Julia Wilson, Service Address: 3710 S. Emporia Way Unit V201, Aurora, Colorado 80014, Current Account: Subscriber Name: Julia Wilson Address: 3668 S. Dallas St. Unit 308, Aurora, CO 80014; and (2) IP Address: 2603:300b:701:7e00:55a4:4882:5936:def6 assigned on 10-04-2019 at 00:37:56 UTC, Subscriber Name: AMI CO, Service Address: 6746 S. Revere Pkwy Unit 135, Centennial, CO 80112 ATTN Parker Wilson.

53. I researched in Denver Police Department databases and public databases, which revealed on February 25, 2020, Parker Wilson updated his Colorado Department of Motor Vehicles Driver's license with his address as 3668 S. Dallas St. Unit 308, Aurora, CO. I found The Awakened Mind Institute (AMI) at the Denver Psychotherapy Center website, which states Dr. Wilson Parker is the founder of AMI with the address 6746 S. Revere Pkwy Unit 135, Centennial, CO.

54. On April 28, 2020, the Honorable Magistrate Judge Michael E. Hegarty approved the Application for a Search Warrant for the contents of the Dropbox account associated with Dropbox User #16151870, with e-mail address parker@amidenver.com, and Screen/User Name: Parker Wilson. *See* Case No. 20-sw-00434-MEH.

55. On May 29, 2020, pursuant to the federal search warrant issued as referenced above, I reviewed the contents of the Dropbox account associated with Dropbox User #16151870, with e-mail address parker@amidenver.com, and Screen/User Name: Parker Wilson. I found four videos of child pornography and 327 images of child pornography. Examples of the images and videos are as follows:

    A. Video "0.mp4" shows a prepubescent female naked with her socks on; the female is inserting her fingers in her vagina with an object inserted in her anus. The scene changes with the female lying face down on top of a naked adult male with a black object inserted in her anus. The scene changes, showing the female with an adult penis inserted in her mouth performing oral sex; the adult male pulls his penis out and ejaculates on her mouth, face, and chin area.

    B. Image "56.jpg.gif" - A prepubescent female naked from waist down with an adult finger inserted in her anus, moving back and forth. The female's vagina is exposed. (Note: gif = "Graphics Interchange Format." GIFs are a series of images or soundless videos that will loop continuously and doesn't require anyone to press play.)

56. On June 2, 2020, I drove by 3668 South Dallas Street, Aurora, Colorado. The location was found to be a multi-family apartment complex, the Dayton Station Apartments. The address number "3668" for the apartment building is clearly on the building in yellow numbers and letters. The apartment number "308" is located in the middle of the door of the particular apartment in black numbers, clearly visible. I observed parked on South Dallas Street in front of building "3668" a 2004 Nissan Pathfinder, CO plates (189PUU), registered to Parker Wilson. I also drove by 6746 South Revere Pkwy, Centennial, CO. The location was found

to be an office park, Parkgate.  I found the building address "6746" to be clearly marked on the building and on the entrance just right of the door with white numbers and letters.  The suite number "135" is located to the left of the door in white numbers, clearly visible.

## INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND POSSESS, RECEIVE AND/OR DISTRIBUTE CHILD PORNOGRAPHY

57. Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who possess, receive, distribute or access with intent to view child pornography have a sexual interest in children and in images of children.  Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

   A. The majority of individuals who collect child pornography are persons who have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

   B. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.  The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.  Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children.  Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant.  In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

   C. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They almost always maintain their collections in the privacy and security of their homes, offices, cars, garages, sheds, and other secure storage locations, such as in a digital or electronic format in a safe, secure, and private environment, including in cloud-based storage online or on their person.

   D. The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support.  This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior.  The different Internet-based vehicles used by such individuals to communicate with each other include, but

14

are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

E.  The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires.  Such individuals rarely destroy these materials because of the psychological support they provide.

F.  The majority of individuals who collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral, exchange or commercial profit.  These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

G.  Based upon training and experience, I know that persons in engaged in the possession of child erotica are also often involved in the possession of child pornography.  Likewise, I know from training and experience that persons involved in the possession of child pornography are often involved in the possession of child erotica.

H.  Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses.  Additionally, based on this training and experience, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.

## CONCLUSION

58. Based on the investigation described above, probable cause exists to believe that at the premises located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of violation of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5) (described on Attachment B).

59. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

s/John Donohoe

John Donohoe, Task Force Officer
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me by reliable electronic means this 9th day of June, 2020.

BY THE COURT:

N. REID NEUREITER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

Application for search warrant was reviewed and is submitted by Emily Treaster, Assistant United States Attorney.